FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
OCT 18 2010
JAMES W. McCORMACK, CLERK
By: DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

AMBER SHELTON, As Administratrix of The Estate of Brenda Shelton, Deceased — PLAINTIFF

V. CASE NO. 4:10-CV-1519 JLH

THE ARKANSAS DEPARTMENT OF HUMAN SERVICES, CHERYL MILLER, Individually, and In Her Official Capacity as an Employee of The Arkansas Department of Human Services, SHARON THOMPSON, Individually, and In Her Official capacity as an Employee of The Arkansas Department of Human Services, DR. JOHN SCHAY, Individually, And In His Capacity as a Physician at the University of Arkansas System, LEVITA FISHER, Individually, and In Her Official Capacity as an Employee of Arkansas State Hospital, ROSALIND HUNTER, individually, and ALBERT KITTRELL, LINDA PARKER, CHARLES SMITH, Individually, and In His Official Capacity as Administrator Of The Arkansas State Hospital — DEFENDANTS

This case assigned to District Judge Holmes
and to Magistrate Judge Volpe

**COMPLAINT**

COMES NOW the Plaintiff, by and through counsel, Harrill & Sutter, PLLC, and for her Complaint, she states:

**PARTIES AND JURISIDICTION**

1. Plaintiff is the duly acting and appointed Administrator for the Estate of her mother, Brenda Shelton. The Defendants, Linda Parker, John Schay and Albert Kittrell, are each a UAMS physician, duly licensed by the Arkansas State Medical Board, who is covered by a policy of insurance. Rosalind Hunter was a UAMS employee, covered by a policy of insurance. Charles Smith, is the duly acting and appointed Administrator for the Arkansas State Hospital, a Division of the Arkansas Department of Human Services. The remaining Defendants, Levita Fisher, Cheryl Miller, and Sharon Thompson, are nurses credentialed by the

Arkansas State Nursing Board who are sued both in their individual and official capacities. This is an action brought for medical negligence, negligence, and deprivation of Brenda Shelton's rights granted to her by the United States Constitution, and the Arkansas Civil Rights Act of 1993, as permitted by 42. U.S.C. §1983 and the Arkansas Civil Rights Act of 1993. Since this case involves a federal question, this Court has subject matter jurisdiction under 28 U.S.C. §1331, as well as personal jurisdiction over the parties. Since the events giving rise to this action arose within this Court's district, venue is proper under 28 U.S.C. §1391(b).

## GENERAL ALLEGATIONS OF FACT

2. Brenda Shelton was a citizen of the State of Arkansas, who suffered from a severe mental illness that substantial limited her ability to think and concentrate.

3. Brenda Shelton admitted herself under Dr. Parker's care to the Arkansas State Hospital on or about October 20, 2008, where she was housed in Unit B, and immediately placed on suicide watch.

4. However, acting under the instructions of Dr. Parker, Ms. Shelton was inappropriately taken off suicide prevention.

5. Three (3) days later, Ms. Shelton attempted to hang herself in her room.

6. Before Ms. Shelton attempted to hang herself, the Arkansas State Hospital had recently moved to a new part of the facility.

7. Before the move, resuscitation supplies such as AMBU bags had been kept in the common area.

8. However, after the move, the AMBU Bag, allegedly, under policy, was required to be kept in a locked medication room.

9. On October 25, 2008, the nurse responsible for the med room, accidentally locked the key card in the med room which prevented the other Arkansas State Hospital staff, including the Defendant nurses and physicians, from having access to the rebreather bag during the emergency.

10. There appears to have been promulgated a policy that allowed nurses to withhold rescue breathing in the absence of a protective device, as well as a policy of understafffing.

11. Alternatively, there was a failure to train these nurses, which resulted in Brenda Shelton's death.

12. When Ms. Shelton was found lying unconscious, she was still capable of being resuscitated.

13. However, because of Mr. Smith's, Ms. Hunter's, and Dr. Kittrell's failure to train, and failure to implement appropriate policies, the other Defendant nurses failed to give Ms. Shelton rescue breathing.

14. Arkansas State Hospital personnel had previously requested that protective devices be made readily available, but Arkansas State Hospital Administration made the deliberate policy choice not to offer protective barriers to its nursing staff.

15. It was reasonably foreseeable that persons like Ms. Shelton would suffer injury in the absence of a protective barrier.

16. Nonetheless, the three (3) nurses on duty and present at the time Ms. Shelton lay unconscious, refused to administer rebreathing. In fact, one nurse was instructed not to administer rebreathing, even though patients are routinely tested for infectious diseases upon admission to the hospital. Ms. Shelton's chart did not indicate she had any infectious diseases at the time of her admission.

17. Once Dr. Schay was called, the physician also failed to administer or order rescue breathing, all to the detriment of Ms. Shelton.

**COUNT I**

18. Plaintiff re-alleges the foregoing as is fully set out herein.

19. Brenda Shelton was a person with a disability, as that term is defined by Title II of the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act of 1973.

The Arkansas State Hospital is a federal financial aid recipient.

20. There has existed a culture of abuse at the Arkansas State Hospital for several years, as detailed in the report attached hereto as Exhibit "A".

21. The Arkansas State Hospital and The Arkansas Department of Human Services are recipients of federal financial aid.

22. The Defendants willfully, and intentionally failed to place Ms. Shelton in an environment appropriate to her needs, as required by the ADA, the Rehabilitation Act, and 28 C.F.R. §35.130.

23. As a direct and proximate cause of Defendants' violation of the ADA and the Rehabilitation Act, Ms. Shelton lost her life, and incurred unnecessary pain and suffering.

24. Indeed, Ms. Shelton survived for several days after her attempted hanging, thereby incurring medical expenses and prolonging her suffering.

**COUNT II**

25. Plaintiff re-alleges the foregoing as is fully set out herein.

26. Ms. Brenda Shelton had a constitutionally protected property right in her life, as well as the right to the pursuit of happiness. However, under the circumstances alleged herein, Ms. Shelton was denied these rights without due process, was subjected to cruel punishment, and Defendants were deliberately indifferent to an obvious and serious medical need. This action is brought under substantive and due process theories.

27. In addition to the above, all Defendants are sued in their individual and official capacities for their failure(s) to train, for their ratification of co-Defendants' actions, for the deliberate policy decision not to provide staff with protective devices, and for denying Brenda Shelton equal protection under the law.

28. As a direct and proximate cause of the acts and omissions of Defendants as alleged herein, Brenda Shelton has suffered unnecessarily, incurred medical expenses that otherwise would not have been incurred, suffered severe mental and emotional distress,

including the loss of her life.

29. All of Defendants' actions were taken under color of Arkansas State Law and were deliberately indifferent.

30. Defendants' actions have been so egregious so as to warrant the imposition of punitive damages against them in their individual capacities.

**COUNT III**

31. Plaintiff re-alleges the foregoing as is fully set out herein.

32. One or more of the nurses or physicians is covered by a policy of liability insurance.

33. The physicians and the nurses failed to exercise that care normally exercised by nurses or physicians, when presented with the same or similar circumstances in Pulaski County, Arkansas in 2008. Dr. Schay failed to properly direct CPR, and Dr. Parker removed Ms. Shelton from line of sight. Nurse Fisher failed to ensure a rebreather device was available, and Nurses Thompson and Miller failed to administer rescue breathing. Indeed, Nurse Thompson directed Ms. Miller not to give Ms. Shelton rescue breathing. Further, Nurse Hunter and Dr. Kittrell failed to train the nurses who refused to do rebreathing.

34. As a result of the Defendants' failures to exercise ordinary care, Ms. Shelton died. Also, Ms. Shelton incurred unnecessary medical bills.

**DAMAGES**

35. As a direct and proximate cause of Defendants' acts and omissions alleged herein, Plaintiff sues for all available relief under the law, including, but not limited to, loss of life, loss of enjoyment of life, wrongful death, pain and suffering before death, medical bills incurred because of the actions that occurred herein, for an injunction to require the Defendants to provide mentally ill or disabled patients with care in the least restrictive environment appropriate to their needs, for declaratory judgment that the Defendants violated the ADA and the Rehabilitation Act, and for all other proper relief.

Respectfully submitted,

HARRILL & SUTTER, PLLC
Attorneys at Law
P. O. Box 2012
Benton, Arkansas 72018
501/315-1910

*/s/ Luther Oneal Sutter*
Luther Oneal Sutter, Ark. Bar No. 95031
*luthersutter@yahoo.com*

AND

Gregory Ferguson
Ark. Bar No. 80043
600 West Fourth St.
N. Little Rock, AR 72114
(501) 374-3535



Disability
Rights
Center

# DIRTY LAUNDRY: INVESTIGATION REPORT OF ALLEGED PATIENT ABUSE AT THE ARKANSAS STATE HOSPITAL

## A SUMMARY

This publication was made possible by funding support from the Center for Mental Health Services, Substance Abuse and Mental Health Services Administration. These contents are solely the responsibility of the grantee (Disability Rights Center) and do not necessarily represent the official views of the Center for Mental Health Services, Substance Abuse and Mental Health Services Administration.

Disability Rights Center, 2005

EXHIBIT
A
Blumberg No. 5208

*Dirty Laundry: Investigation Report of Alleged Patient Abuse at the Arkansas State Hospital*

Disability
Rights
Center

## TABLE OF CONTENTS

I. Introduction....................................................................4
The Arkansas State Hospital....................................................4
The Disability Rights Center (DRC) Investigation..............................5

II. Patient Abuse Allegations Investigated......................................7
A. Allegations.....................................................................7
B. Conclusions....................................................................7
C. Conclusions Common to Multiple Patient Abuse Investigation Reports..........8
D. Recommendations..............................................................9

III. Systemic Conclusions and Recommendations.................................13

IV. History and Authority of the Disability Rights Center.....................16

V. Glossary of Terms/Acronyms..................................................18

Attachments:

ASH Policy 05.01.01, *Reporting Patient Abuse*
ASH Policy 05.01.02, *Variance Reporting for Management of Aggressive Patients*
ASH Policy 05.01.03, *Reporting Serious Incidents*
ASH Policy 05.01.04, *Protocol for Incident Analysis and Debriefing*
ASH Policy 05.02.01, *Variance Review Policy*
*Arkansas State Hospital Performance Improvement Plan* (2004)



# I. INTRODUCTION

Hospitals take care of people who are sick, and help them heal.

From May 2003 through February 2005 at least nine (9) patients at ASH suffered, not from the symptoms of their mental illnesses, but from verbal and physical abuse at the hands of some of the professionals who were supposed to be helping them recover. Inexplicably, supervisors, managers and hospital administration either professed ignorance, denied the abuse had occurred, or looked the other way.

From a verbal threat of physical violence credible enough to prompt one staff member's co-workers to restrain him as he yelled and lunged at a patient, to broken bones, the abuse committed against these nine patients did not start coming to light until the fall of 2004, when Disability Rights Center (DRC) received the first of several "tips," all alleging that something was horribly wrong at ASH.

***The Arkansas State Hospital***

The Arkansas Constitution mandates that the State provide care and treatment to people with mental illnesses.[i] One of the ways the State determined to satisfy that mandate was through the construction, staffing and funding of operations at the Arkansas State Hospital (ASH). Located in Little Rock, ASH sits atop a grassy hillside adjacent to West Markham and directly across the street from the world renowned University of Arkansas for Medical Sciences (UAMS) Medical Center, "where medicine lives."[ii] The medical doctors practicing psychiatry at ASH are employed by the UAMS Medical Center, and some serve as faculty for UAMS as well. Owned and operated by the State of Arkansas, like its sister hospital, ASH, the UAMS Medical Center, or "Med Center," as it is known to many, provides "world class care" to people with physical illnesses, according to televised commercials.

However, there are few similarities between the sister hospitals. In fact, ASH appears to be the proverbial "red-headed stepchild." ASH is a locked and fenced psychiatric hospital, providing in-patient acute, long-term residential and forensic mental health treatment to adolescent and adult patients twenty-four hours per day, seven days per week. Licensed by the Arkansas Department of Health for 321 beds, ASH is operated by the Division of Behavioral Health (DBH), under the larger umbrella of the Arkansas Department of Human Services. As of the writing of this investigation report, ASH currently staffs 202 beds, 170 of which are adult unit beds, and the remaining thirty-two (32) beds are on adolescent units. The type of mental health treatment offered for adolescents and adults breaks down as follows:[iii]



| Beds for adults (>18 years of age) | | Beds for adolescents (13 to 18 years of age) | |
|---|---|---|---|
| Acute | 74 | Acute | 1 |
| Forensic | 96 | Long term residential | 15 |
| | | Sex offender | 16 |

Average length of acute stay for adults is 61.25 days. Average length of stay for acute adolescent patients from 2/04 - 3/05 was nine (9) days. The average length of stay for adolescents in the sex offender program during state fiscal year 2004 was 561 days (approximately eighteen (18) months). In state fiscal year 2004, 999 patients were admitted to ASH for evaluation and treatment. ASH's five treatment units for housing patients are unit 1 for adolescents, and units 2, 3, 5, and 6 for adults. (Unit 4 contains recreation equipment, as well as recreation, patient advocate and other staff offices.) The physical layout of the units is in a rough circle with a central courtyard. The forensic unit, which contains Patient Units 5 and 6, also has a gymnasium/activity center and the Public Safety Department. Patient units have surveillance and monitoring cameras installed for patient safety, with the Adolescent Unit containing the greatest number of cameras.[iv]

Patient abuse occurring within psychiatric hospitals like ASH can take many forms, some more obvious than others. These hospitals are the most restrictive in terms of an individual's personal liberty, and are most often locked facilities, in which the patient is only allowed off his/her assigned unit or outdoors under very close supervision. Going outdoors means being separated from the "outside world" by a fence with numerous locked gates. Sometimes the fences surrounding psychiatric hospitals have barbed ("concertina") wire woven through or on top of traditional chain link fences in an effort to discourage escape, or "elopement," as it is called in the world of mental health treatment.

***The Disability Rights Center (DRC) Investigation***

Disability Rights Center (DRC) began receiving contacts about possible patient abuse at ASH in September 2004, with an allegation made by a confidential informant that a patient had died in a seclusion room at ASH that month.[v] Approximately one month later, DRC received an anonymous report of a patient being verbally and physically attacked by a staff member of ASH. DRC was in the process of investigating that allegation when, in February 2005, three more anonymous and confidential contacts were received, different from those of the previous year, alleging verbal and/or physical abuse of patients by staff. The number of patients alleged to have been abused by staff over a twenty-one month period of time totaled nine – and those were the ones about which DRC received information.[vi]



The decision to conduct an investigation was made while allegations were still coming into DRC's office. On February 14, 2005, the DRC Quality Assurance Team Leader met with Pat Dahlgren, Director of the Division of Behavioral Health (DBH), to outline the allegations received by DRC. Ms. Dahlgren readily agreed that an investigation should be conducted. On February 17, 2005, DRC provided Ms. Dahlgren with written notice that the DRC investigation would begin on February 22, 2005. A list of documents and other evidence needed for DRC's review was provided to Ms. Dahlgren in the written notice.

Four members of DRC's Quality Assurance Team (QA Team), supervised by three DRC attorneys, began the on-site portion of the investigation on February 22, 2005, with a review of the documents, audiotapes, photographs and videotape provided, making additional requests for documents, organizing all documents received, and drafting initial witness lists for each patient incident. DBH Director Dahlgren provided Asst. Director Charles Smith to DRC's QA Team as DBH's point person for information requests and to assist in scheduling interviews of individuals on the ASH campus. The QA Team was accompanied by DBH Asst. Director Smith, DBH Asst. Director Vanessa Davis, ASH Patient Advocate Tony Davis, ASH Quality Improvement Director Jenifer Marsh and ASH Human Resources Director George Bryant for the on-site interviews. DBH Director Pat Dahlgren attended the DRC interview of ASH Administrator Glenn Sago. During the course of the investigation, DRC learned of another allegation of patient abuse, and incorporated investigation of that incident into the larger effort. DRC was unable to identify one patient on whose behalf an allegation had been received.

In all, the investigation took nearly three months to complete - from February 22, 2005, to May 15, 2005, and involved almost 1,100 DRC staff hours. The four DRC investigators, working in pairs, interviewed sixty-seven (67) witnesses in 109 separate interviews that produced over 2,100 pages of transcribed interviews.



## II. PATIENT ABUSE ALLEGATIONS INVESTIGATED

### A. Allegations

**Patient 1,** a sixteen (16) year old female alleged to have been choked during a restraint by a staff member of the Public Safety Department;

**Patient 2,** a twenty-four (24) year old male alleged to have been verbally and physically abused by a staff member of the Public Safety Department;

**Patient 3,** a twenty-one (21) year old male alleged to have been verbally abused by a forensic unit mental health worker. The allegation also included a claim that several ASH staff had to restrain the mental health worker to keep him from physically assaulting Patient 3;

**Patient 4,** a twenty-nine (29) year old male alleged to have been picked up by his genitals and dragged toward a stairwell by a staff member of the Public Safety Department;

**Patient 5,** a thirty-four (34) year old male alleged to have been lifted into the air and allowed to fall to the floor by two staff members of the Public Safety Department;

**Patient 6,** a fifty-nine (59) year old male who was not technically a patient at ASH, but was being detained in a screening room, and who was alleged to have been kneed in the side by a staff member of the Public Safety Department;

**Patient 7,** a thirty-eight (38) year old female whose arm was allegedly broken during a restraint event by a staff member of the Public Safety Department;

**Patient 8,** a forty-nine (49) year old male who was allegedly kneed in the side and received a fracture to the ninth rib during a restraint event by a staff member of the Public Safety Department;

**Patient 9,** a twenty-six (26) year old male who was allegedly shoved by a staff member of the Public Safety Department.

### B. Conclusions

**Patient 1** – Allegation of physical abuse substantiated.

**Patient 2** – Allegation of physical and verbal abuse substantiated.



**Patient 3** – Allegation of verbal abuse substantiated; evidence inconclusive to substantiate allegation of physical abuse.

**Patient 4** – Evidence inconclusive to substantiate allegation of physical abuse.

**Patient 5** – Allegation of physical abuse substantiated.

**Patient 6** - Evidence inconclusive to substantiate allegation of physical abuse.

**Patient 7** – Allegation of physical abuse substantiated.

**Patient 8** – Allegation of physical abuse substantiated.

**Patient 9** – Allegation of physical abuse substantiated.

## C. Conclusions Common to Multiple Patient Abuse Investigation Reports

1. ASH failed to comply with the requirements of ACA § 20-47-109 *et seq.*, with respect to identification, reporting, investigation or remedial action in all of the nine (9) patient abuse allegations investigated by DRC.[vii]

2. ASH failed to comply with the requirements of ASH Policy 05.01.04, *Protocol for Incident Analysis and Debriefing*, for the six (6) patient abuse incidents which occurred after the effective date of the policy.

3. ASH Policies 05.01.01, *Reporting Patient Abuse*, and 05.01.03, *Reporting of Serious Incidents*, were in effect when each of the nine (9) patient abuse incidents investigated by DRC occurred. Three (3) patient incidents were the subject of ASH internal investigations (Patients 2, 3, and 4) and there was an internal *personnel* investigation in the case of Patient 5. The ASH internal investigation with respect to Patient 4 recommended further investigation, follow-up and discipline of the abuser. That recommendation went unheeded by ASH managers, supervisory personnel and hospital administration.

The ASH internal investigations with respect to alleged abuse of Patients 2 and 3 concluded that physical abuse did not take place, although verbal abuse was substantiated with respect to Patient 2. A meeting between Patient 2's alleged abuser and his supervisor concluded with the abuser being allowed to resign without discipline for the abuse, leaving the personnel record of the staff member without mention of the finding of abuse, and eligible for rehire at ASH. None of the ASH internal investigations included determinations about antecedents for the incident, or made any findings as to what could have been done to prevent the incident from occurring.



Both policies require subordinate staff that witness or suspect abuse of patients to notify supervisory and/or management staff about the suspected patient abuse. Management and/or supervisory staff are to immediately notify the relevant abuse hotline of the suspected abuse. In the cases of Patients 1, 2, 3, 4, 5, and 8, subordinate staff did report as required, sometimes verbally, and sometimes via *Variance Reports* about the incidents. However, management and supervisory staff failed to make calls to the appropriate hotlines in eight of the nine patient abuse incidents investigated by DRC.

4. Only one (1) of the patient abuse incidents investigated by DRC complied fully with the documentation requirements of ASH Policy 05.01.02, *Variance Reporting for Management of Aggressive Patients* – that of Patient 9.

5. Seven of the nine patient abuse incidents could have been prevented, and six of the incidents were precipitated by ASH staff.

6. Despite the intended "checks and balances" system of ASH Policy 05.02.01, *Variance Review Policy*, the Hospital Administrator told DRC in his March 17, 2005, interview that he had never heard the details of incidents involving Patients 3, 4, 8, and 9 in the weekly Variance Review Committee meeting required by the policy.

7. None of the internal patient abuse investigations conducted by ASH complied fully with the documentation requirements of ASH Policies 05.01.01, *Reporting Patient Abuse*, and 05.01.03, *Reporting of Serious Incidents*, which together require written investigation reports, documentation of patient injuries by photographs, and witness interviews with anyone – *other patients included* – who witnessed the incident.

**D. <u>Recommendations</u>**

The recommendations that follow are relevant to the individual patient incidents. Systemic recommendations may be found at page 14 of this report.

**Patient 1**

1. ASH should immediately initiate appropriate disciplinary action against PSO staff for the physical abuse of Patient 1.

2. DBH/ASH should immediately initiate appropriate disciplinary action against hospital administration staff and PSO staff for failing to report the abuse of Patient 1 to the child abuse hotline.

3. ASH should immediately notify the child abuse hotline about the incident with Patient 1 for investigation of this incident by the hotline.



4. DBH/ASH should immediately initiate appropriate disciplinary action against PSO staff and hospital administration staff for failing to conduct an investigation of the incident.

5. ASH should immediately initiate appropriate disciplinary action against PSO staff for failing to report the abuse of Patient 1 to their immediate supervisor as mandated reporters of abuse.

**Patient 2**

1. DBH/ASH should immediately initiate appropriate disciplinary action against hospital administration staff and PSO staff for failing to report the abuse of Patient 2 to the adult abuse hotline.

2. ASH should immediately notify the adult abuse hotline about the incident with Patient 2 for investigation of the incident by the adult abuse hotline.

3. Personnel records of staff responsible for abusing patient should reflect the findings and conclusions of the DRC investigation report.

**Patient 3**

1. ASH should immediately initiate appropriate disciplinary action against nursing staff for the abuse of Patient 3.

2. DBH/ASH should immediately initiate appropriate disciplinary action against nursing staff, PSO staff and hospital administration staff for failing to report the abuse of Patient 3 to the adult abuse hotline.

3. ASH should immediately notify the adult abuse hotline about the incident with Patient 3 for investigation of the incident by the adult abuse hotline.

**Patient 4**

1. ASH should immediately initiate appropriate disciplinary action against PSO staff for failing to report the allegation of abuse made by Patient 4 to their immediate supervisor as mandated reporters of abuse, and for failing to complete a required *Variance Report* on the incident.

2. DBH should immediately initiate appropriate disciplinary action against PSO staff and hospital administration for failing to follow-up on recommendations made in the ASH internal investigation of this incident.



**Patient 5**

1.   ASH should immediately initiate appropriate disciplinary action against nursing staff for failing to use appropriate therapeutic interventions with Patient 5, and causing the patient abuse incident.

2.   ASH should immediately initiate appropriate disciplinary action against nursing staff for failing to prevent/contributing to the abuse of Patient 5.

3.   ASH should require all nursing staff to undergo additional nurses' training in the appropriate administration of chemical restraint, or PRN medication.

4.   DBH should immediately initiate appropriate disciplinary action against PSO staff and hospital administration staff for failing to report the abuse of Patient 5 to the Adult Protective Services hotline.

5.   ASH should immediately notify the adult abuse hotline about the incident with Patient 5 for investigation of the incident by the adult abuse hotline.

**Patient 6**

1.   ASH should immediately initiate appropriate disciplinary action against PSO staff for failing to report the abuse of Patient 6 to his immediate supervisor as a mandated reporter of abuse.

2.   ASH should initiate appropriate disciplinary action against PSO staff for misleading DRC investigators about his involvement in the incident with Patient 6.

**Patient 7**

1.   ASH should immediately initiate appropriate disciplinary action against PSO staff for misleading ASH and DRC investigators and using excessive force to restrain Patient 7.

2.   ASH should immediately initiate appropriate disciplinary action against nursing staff involved in the patient abuse incident with Patient 7, and the failure to use appropriate therapeutic interventions.



3. ASH should develop and implement a policy and procedure documenting patient's request to view his/her medical records. If the treatment team determines that certain information is inappropriate for the patient to view, then the patient should be notified in writing that his/her request has been denied.

4. DBH/ASH should immediately initiate appropriate disciplinary action against nursing staff, PSO staff and hospital administration staff for failing to report the abuse of Patient 8 to the adult abuse hotline.

5. ASH should immediately notify the adult abuse hotline about the incident with Patient 7 for investigation of the incident by the adult abuse hotline.

**Patient 8**

1. DBH/ASH should immediately initiate appropriate disciplinary action against PSO staff and nursing staff for failing to report the abuse of Patient 8 to the adult abuse hotline.

2. ASH should immediately notify the adult abuse hotline about the incident with Patient 8 for investigation of the incident by the adult abuse hotline.

3. DBH/ASH should immediately initiate appropriate disciplinary action against nursing staff, PSO staff and hospital administration staff for failing to conduct an internal investigation of the incident.

4. The personnel record of staff responsible for this patient's abuse should reflect the findings and conclusions of the DRC investigation report.

**Patient 9**

1. DBH should immediately initiate appropriate disciplinary action against PSO staff and hospital administration staff for failing to conduct an internal investigation of the incident.

2. The personnel record of staff responsible for this patient's abuse should reflect the findings and conclusions of the DRC investigation report.



## III. SYSTEMIC CONCLUSIONS AND RECOMMENDATIONS

**SYSTEMIC CONCLUSIONS:**

A. **Patients at ASH are in "immediate jeopardy."** There is no coherent system of identification, reporting, investigation and remedial action with respect to patient abuse at the Arkansas State Hospital. As a result, each and every patient at ASH is at risk of abuse, which places patients in "immediate jeopardy."

The term "immediate jeopardy" is defined in the Code of Federal Regulations as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." The State Survey Agency (SA) designated by the Centers for Medicare and Medicaid Services (CMS), the Arkansas Department of Health (ADH), is charged with investigating allegations of immediate jeopardy and DRC has provided ADH a copy of the entire investigation. DRC has also provided the Dallas regional office of CMS and the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) a copy of the entire investigation.

B. **Surveillance and monitoring camera equipment installed for patient safety failed to work properly for an extended period,** and unit nursing staff were not notified of the failure of the equipment on a timely basis by Public Safety Department staff.

C. **A culture of abuse exists within ASH,** with numerous ASH staff failing to recognize that the people housed within the walls of ASH are *patients in a hospital.*

D. **Hospital administration fails to enforce ASH policies and state laws** designed to prevent, recognize, report, investigate and take remedial action against staff who abuse patients.

E. **Staff charged with conducting internal investigations of allegations of patient abuse are undertrained or untrained.** ASH internal investigations routinely fail to pinpoint causes of the incidents, including instances when patients are agitated by ASH staff. In addition, ASH internal investigations rarely include documentation sufficient to establish the manner in which conclusions have been determined. According to statements made to DRC investigators, hospital administration often does not receive written investigation reports.



**F. Public Safety Department staff often refuse to seek direction from nursing staff.** In four patient abuse incidents investigated by DRC, Public Safety Department staff refused to either seek or defer to unit nursing staff for direction about whether, or the manner in which to engage a patient. This refusal violates a long established practice at ASH of nursing staff directing activities designed to calm agitated patients, due to the need to exercise clinical judgment to ensure the health and safety of patients.

**G. ASH nursing staff fail to use Public Safety Department staff in a manner that protects patients from abuse.**

**H. The ASH Performance Improvement Plan.** There simply is no way for the ASH Performance Improvement Council to take actions for deficiencies related to keeping patients safe in the current climate – where failure to identify, report, investigate and take remedial action with respect to patient abuse is rampant. The *ASH Performance Improvement Plan*, required by federal regulation, states in part, "All Medical Staff quality improvement, peer review, and risk management findings will be reviewed within the Patient Care Monitoring functions of the Executive Medical Staff. It is this committee's responsibility to make recommendations and take actions for those deficiencies."

**I. ASH staff and hospital administration violated the requirements of ACA § 20-47-109(b)(1) and (b)(2) in each of the nine patient incidents. (See Endnote vii)**

**SYSTEMIC RECOMMENDATIONS:**

**A. JCAHO and ADH should immediately investigate the DRC finding of "immediate jeopardy" and take appropriate action.**

**B. DBH should immediately and formally adopt a "zero tolerance" policy against patient abuse,** which should be communicated in writing to *all staff* of ASH and documented in the personnel files of each.

**C. DBH should take the necessary steps to ensure hospital administration provides strong and competent leadership with respect to patient safety.**

**D. ASH should begin immediate (re)training of all ASH staff,** *not just direct care staff*, in the requirements of the ASH policies and state laws that relate to the care and treatment of patients at ASH. ASH should take immediate and appropriate disciplinary action against any staff failing to comply with the referenced policies and state laws. Written documentation of re-training should be incorporated into each staff member's personnel file.



**F. ASH should immediately develop a policy requiring *priority written* reporting and repairing of any equipment installed for patient safety.** The policy should also provide for documented telephone notification of nurse managers/charge nurses of nursing units in which video surveillance and/or recording equipment fails within fifteen (15) minutes of the noted failure by any Public Safety staff in the Public Safety control booth.

**G. ASH should develop a policy for the briefing of Public Safety staff *upon admission* of a patient with a history of sexual and/or physical abuse**, or any medical condition in which the use of personal or mechanical restraint would be contraindicated due to an increased likelihood of mental or physical injury.

**H. Anyone detained against his/her will at ASH, *whether admitted to the hospital for evaluation/treatment or not*, should be assessed for any medical conditions which may require monitoring during the detention of the individual.**

**I. DBH should immediately place the supervision of the Director of Nursing (and therefore all nursing staff) solely with ASH's Medical Director.**

**J. The long established practice of nursing staff directing activities designed to calm agitated patients, and therefore being "in charge" during patient seclusion/restraint events should be formalized into a policy,** with appropriate sanctions for non-nursing staff violations of the policy.

**K. ASH should develop a better mechanism to ensure professionalism and to address issues of inappropriate clinical interactions and interventions by its employees.** One approach might be to address the personnel hiring practices or raising the qualifications standard for the employment of mental health workers and other direct care staff.

**M. DBH should take immediate steps to employ or contract with *trained* civil investigators to conduct internal investigations of allegations of patient abuse.** DRC recommends a team of no fewer than three investigators, and further recommends that the investigative team receive no supervision or compensation from ASH, but instead receive supervision and compensation for their work from the DBH.

**N. ASH should assist patients in executing affidavits and other documentation necessary for the filing of criminal charges of battery and terroristic threatening against a staff member** when a staff member allegedly commits such acts in the same way the hospital now assists staff when patients allegedly commit such acts.



**O. DBH/ASH should immediately initiate appropriate disciplinary action against *all* staff of ASH involved in the nine patient abuse incidents for violation of ACA § 20-47-109(b)(1) and (b)(2). *See* endnote vii.**

## IV. HISTORY AND AUTHORITY OF THE DISABILITY RIGHTS CENTER

### HISTORY OF THE DISABILITY RIGHTS CENTER

Disability Rights Center, Inc. (DRC) was first incorporated as a 501(c)(3), private non-profit corporation in Arkansas in 1980. The first corporate name of the protection and advocacy (P&A) system was Advocacy Services, Inc. The organization first received funding as the Arkansas Developmental Disabilities Advocacy System in 1977, having been designated by the Governor as the P&A for people with developmental disabilities.

Grants in other P&A service areas were received in the following order:

- Client Assistance Program (CAP) established in 1984.
- P&A for Individuals with Mental Illness (PAIMI) established in 1986.
- P&A for Individual Rights (PAIR) established in 1993.
- P&A for Assistive Technology (PAAT) created in 1994.
- P&A for Beneficiaries of Social Security (PABSS) established in 1999.
- P&A services for individuals with Traumatic Brain Injuries (TBI) established in September, 2002.
- Help America Vote Act (HAVA) passed in 2003.

### DISABILITY RIGHTS CENTER ACCESS AUTHORITY

Disability Rights Center, Inc. (DRC) is the federally authorized and funded nonprofit organization serving as the Protection and Advocacy (P&A) System for individuals with disabilities in Arkansas. DRC is authorized to protect human, civil and legal rights of all Arkansans with disabilities consistent with federal law.

Pursuant to the Developmental Disabilities Assistance and Bill of Rights Act [42 U.S.C. 15001, 15043; 45 C.F.R. Part 1386]; the Protection and Advocacy for Individuals with Mental Illness Act [42 U.S.C. 10801 et seq.; 42 C.F.R. Part 51]; and the Protection and Advocacy of Individuals Rights of the Rehabilitation Act of 1973 [29 U.S.C. 794e], the P&A System may use any appropriate technique and pursue administrative, legal or other appropriate remedy to protect and advocate on behalf of individuals with disabilities to address abuse, neglect or other violation of law.



In pursuing its statutory responsibilities, the P&A has the authority to gain access to records, facilities and individuals. In addition to its specific authority to gain access for the investigation of suspicion of abuse and neglect [45 C.F.R. 1386.22(f) and 42 C.F.R. 51.42(b)], the P&A is authorized to monitor and provide information [45 C.F.R. 1386.22(g) and 42 C.F.R. 51.42(c)]. As a general right, P&As shall have reasonable unaccompanied access to provide information, training and referrals, and to monitor compliance with respect to the rights and safety of individuals with disabilities.

The Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("DD Act") mandates specific disclosure of individually identifiable health information to Protection and Advocacy systems designated by the chief elected official of the states and Territories. Therefore, covered entities may make these disclosures under Sec. 164.512(a) without first obtaining an individual's authorization, except in those circumstances in which the DD applies with equal force to the Protection and Advocacy for Individuals with Mental Illness (PAIMI) and Protection and Advocacy for Individual Rights (PAIR), given that these laws contain substantially identical requirements to the DD act with regard to mandatory disclosures of identifiable health information.

The HIPAA regulations, at 45 CFR 164.512(a)(1), provide that "A covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and limited to the relevant requirements of such law." Therefore, HIPAA in no way impedes the functioning of the existing Protection and Advocacy System. *See* Ohio Legal Rights Service v. The Buckeye Ranch, Inc., et al., 2005 WL 878095 (S.D. Ohio).



## V. GLOSSARY OF TERMS/ACRONYMS

**Acute mental health treatment** – short term medical treatment, usually in a hospital, for patients having an acute illness which is expected to respond favorably to treatment.

**Anonymous Informant** – a person whose identity is unknown to staff of DRC who provided information about patient abuse allegations to DRC.

**AOD** – Administrator on Duty

**Close obs** – close observation

**Confidential Informant** - a person whose identity is known to staff of DRC who provided information about patient abuse allegations to DRC, and whose identity is protected by DRC.

**CPI**- Crisis Prevention Institute

**Elopement**- a term used to describe a patient leaving hospital grounds without permission of staff.

**Forensic mental health treatment** – mental health evaluation and/or treatment provided to patients who have been charged with or acquitted of crimes.

**IM** – intramuscular injection (of medication)

**IRIS** – Incident Reporting Information System (of DHS)

**Long-term residential mental health treatment** – treatment for patients who have completed acute care, but are still not ready to return to their communities and maintain recovery.

**LOS** – line of sight

**MHW** – Mental Health Worker

**NAPPI**- Non-Abusive Psychological Physical Intervention

**NOD** – Nurse on Duty

**P.O.**- by mouth (of medication)



**P.S.O.**- Public Safety Officer

**PRN**- As needed (medication)

**Public Safety Department** – the security force for ASH, and unique among psychiatric hospitals, as it is certified as a law enforcement agency.

**QI Department** – Quality Improvement Department (of ASH)

**Quiet Room** – a small room which usually only contains a bare mattress, into which an agitated patient is placed to allow him/her to calm down so that he/she may return to the unit with peers.

**Seclusion Room** - a small room which usually only contains a bare mattress, into which an agitated patient is placed to allow him/her to calm down so that he/she may return to the unit with peers. The same as "quiet room," except egress is locked or blocked.

**ENDNOTES:**

---

[i] *See* Article 19, Section 19 of the Arkansas Constitution.

[ii] *See* the masthead of the website for UAMS at http://www.uams.edu/

[iii] Source for data: Quality Improvement Department of the Arkansas State Hospital

[iv]

| Unit | Number of cameras monitored (no videotape) | Number of cameras that record video |
|---|---|---|
| Adolescent Unit 1 Upper | 8 interior cameras | |
| Adolescent Unit 1 Lower | 4 in seclusion rooms | 6 interior, 2 exterior |
| Adult Unit 2 Upper | 2 in dining hall, 2 in seclusion room | |
| Adult Unit 2 Lower | 2 in each of 2 seclusion rooms | |
| Adult Unit 3 Upper | 2 in dining hall, 4 in 2 seclusion rooms | |
| Forensic Unit 5 Upper | 2 interior of unit, 2 in a seclusion room | |
| Forensic Unit 5 Lower | 2 in each of 2 seclusion rooms | 1 in front of nurses' station |
| Forensic Unit 6 Upper | 3 on corridors, 3 interior of unit | |
| Forensic Unit 6 Lower | 3 interior of unit | |
| Forensic Unit Gymnasium | 2 | |
| Forensic Unit Entrance | 2 | |



[v] DRC began an investigation into the death and a report of that investigation will be released under separate cover.

[vi] DRC received two more allegations of patient abuse while writing this investigation report. One report involved an allegation that a patient's head was slammed against the forensic unit gymnasium wall by a mental health worker (substantiated) and the other concerned possible excessive force used against a handcuffed and shackled patient in the admissions unit by a member of the Public Safety Department staff (unsubstantiated). In both instances, DRC investigators noted the same concerns as in the previous incidents – the failure of ASH staff to comply with ASH policies and state laws concerning the identification, reporting, investigation and remedial action when patient abuse is alleged. In addition, DRC staff had serious concerns about the continued use of stainless steel handcuffs after DRC had been advised all such handcuffs had been surrendered at the direction of the Hospital Administrator.

[vii] ACA § 20-47-109 *et seq.*, provides:

> (a) Employees, agents, servants, or officers of the Arkansas State Hospital are prohibited from striking, beating, abusing, intimidating, assaulting, or in any manner physically chastising any patient in the Arkansas State Hospital.
>
> (b)(1) It shall be the duty of all employees, agents, servants, or officers of the Arkansas State Hospital, upon learning of a violation of subsection (a) of this section, to immediately notify, in writing, the Director of the Arkansas State Hospital.
>
> (2) Upon receiving a written report of a violation of this section, the director shall immediately investigate the incident and submit a report of the result of his or her findings to the Department of Human Services State Institutional System Board at the next regular meeting thereof.
>
> (3) If the board finds the report to be true and finds that a violation of this section has occurred, the person so violating this section shall be forthwith dismissed from employment at the Arkansas State Hospital and shall be forever ineligible for further employment by the institution.
>
> (4) If the board should determine after reading the report that a violation of the state's criminal laws has occurred, it shall immediately submit the report to the prosecuting attorney.